**SIGNED THIS: April 13, 2018**

_Mary F. Gorman_

_____

**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 15-71018 |
| JOHN C. BENANTI and | ) | |
| DEBRA M. BENANTI, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |

## O P I N I O N

Before the Court are objections by the Chapter 7 trustee and United Community Bank to the allowance of certain claims filed by Marine Bank. At trial, the Chapter 7 trustee deferred to United Community Bank to prosecute the objections. Because United Community Bank did not rebut the prima facie validity of Marine Bank's claims, the claims will be allowed. But, because the claims are contingent and it is unlikely that Marine Bank will be able to exercise its default remedies in the foreseeable future, the claims will be estimated ans allowed at a value of zero.

## I. Factual and Procedural Background

The Debtors, John and Debra Benanti, filed their voluntary Chapter 7 petition on June 29, 2015. According to their schedules and Statement of Financial Affairs, the Debtors are the owners and operators of Benanti King Pin Lanes, LLC ("King Pin Lanes"). On their Schedule D - Creditors Holding Secured Claims, the Debtors, as guarantors, listed two debts owed to Marine Bank related to King Pin Lanes in amounts of $1,647,500 and $235,300. The Debtors received their discharge on October 19, 2015. On November 18, 2015, Marine Bank filed two proofs of claim based on the Debtors' guaranties of loans made to King Pin Lanes in amounts of $1,626,238.27 and $227,482.25.

On August 3, 2016, the Chapter 7 case trustee ("Trustee") filed objections to Marine Bank's claims on the guaranties because the claims were secured by property of an entity other than the Debtors, reasoning that Marine Bank was therefore not entitled to share in the dividend to unsecured creditors. In its response to the Trustee's objections, Marine Bank asserted that the claims were for the guaranties of the underlying secured debt owed by King Pin Lanes and that the guaranties themselves were totally unsecured. Marine Bank's response also stated that King Pin Lanes was in default of the loan agreement due to an "adverse change in financial condition or business operation" that Marine Bank believed might materially affect King Pin Lanes' ability to repay the notes.

On October 6, 2016, United Community Bank ("UCB") filed its objection to Marine Bank's claims on the guaranties, contending that the claims were contingent absent default, that the only default alleged was under the insecurity clause and not exercised in good faith as required by Illinois law, and that, as a

result, there was no default. Marine Bank responded in turn, arguing that the contingent nature of a claim is not a basis for disallowance of the claim. UCB countered that, even if the claims were to be allowed, as contingent claims they would have to be estimated and that the claims should be estimated to have no value.

An evidentiary hearing on the claim objections was held on January 30, 2018.[1] The Debtor, Debra Benanti, testified that she and her husband, John Benanti, owned King Pin Lanes, a limited liability company that operates a bowling center in Springfield, Illinois. The premises itself is leased by King Pin Lanes with an original lease term ending in 2020 subject to five, five-year options to extend. In December 2011, King Pin Lanes obtained a $1,800,000 loan, guaranteed by the Small Business Administration ("SBA") and serviced by First Bankers Trust Company. As collateral, King Pin Lanes gave a security interest in the leasehold property, all personal property and fixtures, as well as certain life insurance policies held by the Debtors. On August 4, 2014, the note was assigned to Marine Bank and refinanced, and a new note was executed for an additional $250,000 loan, guaranteed by the SBA and serviced by Marine Bank. Both loans were incorporated into a Business Loan Agreement executed by Marine Bank and King Pin Lanes. As collateral for the new note, King Pin Lanes gave Marine Bank a security interest in the leasehold property and all personal property and fixtures. In addition, the Debtors had executed unconditional personal guaranties of

---

[1] The Trustee did not prosecute his objections at trial, instead deferring to UCB. Because the Trustee presented no evidence and offered no arguments or authority in support of his objections, he has not met his burden of proof, and his objections will be denied.

payment of the $1,800,000 and $250,000 loans ("SBA loans"), dated December 23, 2011, and August 4, 2014, respectively.

When King Pin Lanes began working with Marine Bank, John Benanti was, and had been for some time, the majority member and primary manager of the business. According to Mrs. Benanti, Mr. Benanti was good friends with Marine Bank's president of 22 years, Roger Chandler. Mr. Chandler testified that, in 2014, Mr. Benanti reached out to him about transferring King Pin Lanes' business loans and refinancing with Marine Bank. Mr. Chandler said that Marine Bank was interested in doing business with King Pin Lanes, and the bank started collecting the company's financial information. The information collected from King Pin Lanes was then compiled in a report that was ultimately used to approve the loan application. He acknowledged that, in King Pin Lanes' application package, there was an appraisal valuing the business at $3,300,000 ("2014 Appraisal") that Marine Bank would have relied on in making its lending decision, although he was not sure whether the bank commissioned the appraisal or whether it was previously obtained by another entity.

Howard Neuger, executive vice president and general counsel for Marine Bank, explained the application process in further detail. He stated that when a loan application and financial information is submitted to Marine Bank, it sends that information to the bank's credit department. The information is then used to generate a credit approval package, which is forwarded to the loan committee for review and approval or disapproval. In some instances, the loan committee might seek guidance from the legal department before making a decision on whether to approve a loan. While he did not specifically recall what involvement he had in the

- 4 -

SBA Loans to King Pin Lanes, he said that he was familiar with the transaction and acknowledged that Marine Bank did rely on the 2014 Appraisal in approving King Pin Lanes for the loans.

Mike Gillespie testified that he is a loan officer at Marine Bank and also handles most of the processing of SBA guaranteed loans. As part of the King Pin Lanes loan approval process in 2014, Mr. Gillespie said that he generated an SBA Loan Report using the financial information provided, which was sent to the SBA for approval. According to the report, at the time King Pin Lanes applied for its loan, the company's liquidity was "somewhat limited" and sales were on the decline. But the report also states that the Debtors planned to sublet the restaurant in the building and make other changes expected to improve the business' bottom line. Further, the report states that the collateral for the loan—the business' leasehold interest in the real estate, as well as a blanket lien on all business assets—was "adequate and suitable to secure" both loans. King Pin Lanes was ultimately approved for the new loan, and its $1,800,000 note was transferred to Marine Bank.

In September 2014, shortly after refinancing with Marine Bank, John Benanti suffered a stroke that rendered him incapacitated, and Mrs. Benanti took over management of King Pin Lanes. Prior to that time, Mrs. Benanti had only worked at the bowling center part time. To assist with the transition, Mrs. Benanti promoted one longtime employee to a management position. Both Mr. Chandler and Mr. Neuger admitted that Marine Bank was aware of Mr. Benanti's stroke shortly after it occurred. In early 2015, after Mrs. Benanti had taken over managing the business, most of Mr. Benanti's membership interest in King Pin

Lanes was transferred to her, making her the majority member. Mrs. Benanti said that this was done in order to maximize Mr. Benanti's social security disability benefits and reflect the fact that she was the one actually running the company. In connection with the transfer of membership interest, certain distributions were made to Mrs. Benanti, $300,000 of which took the form of a promissory note payable to her by King Pin Lanes. Mrs. Benanti emphasized that the promissory note was really just a book entry devised by her accountant to address some tax issues she did not fully understand. She confirmed that she had not actually received any of the funds memorialized by the promissory note.

When the Debtors filed for personal bankruptcy in June 2015, they notified Roger Chandler. Mr. Chandler then relayed that information to Mr. Neuger and other Marine Bank employees. Mr. Chandler said that, after the bankruptcy filing, his involvement with the account was limited. He did, however, create an interoffice memorandum dated July 15, 2015, in which he noted that management had changed since Mr. Benanti's stroke, that the business continued to flourish, and that he saw no reason to be concerned. That same day, Mr. Gillespie conducted a site visit and reported to Marine Bank that King Pin Lanes was open and operating, that it had several bowlers midday, and that the restrooms were well-kept. It was not until a year later that Marine Bank sought updated financial information from the Debtors and King Pin Lanes. Mr. Neuger testified that he believed this was the first that Marine Bank learned of Mrs. Benanti becoming the majority member and the issuance of the $300,000 promissory note to her.

Under the terms of the Business Loan Agreement and other loan

documents, Mr. Benanti's incapacity, the change in majority membership to Mrs. Benanti, the issuance of the $300,000 note to Mrs. Benanti, and the Debtors' bankruptcy were all events of default. These defaults were specifically identified for the first time, however, in a letter from Marine Bank dated October 20, 2016—two years after Mr. Benanti's stroke, more than a year after the Debtors filed their bankruptcy petition, and two weeks after UCB filed its claim objections in the Debtors' bankruptcy. According to the letter, Mr. Benanti's stroke, the resulting change in management and membership to Mrs. Benanti without prior consent, and the couple's bankruptcy were all specific defaults under the loan documents. Incurring the $300,000 debt to Mrs. Benanti negatively shifted the business' Debt Service Coverage Ratio, also triggering a default for not complying with a related provision.[2] According to Marine Bank, together these defaults also demonstrated an adverse change in financial condition or business operation that Marine Bank believed might materially affect King Pin Lanes' ability to pay, which was another event of default. Marine Bank further demanded that, "[i]n order to forbear from exercising its rights and remedies, and as a partial cure of the above-referenced defaults[,]" King Pin Lanes take all steps necessary to restore compliance with the Debt Service Coverage Ratio, pledge an additional $100,000 in cash collateral, and subordinate all indebtedness owed to the Debtors.

After receiving the letter, Mrs. Benanti, through her attorney, began

---

[2] According to the Business Loan Agreement, King Pin Lanes is required to maintain as of each fiscal year end a minimum ratio of net income before taxes, plus certain expenses and minus other expenditures, to principal payments on long term debt, plus interest expense, of at least 1.25:1. Under the terms of the Business Loan Agreement, the $300,000 promissory note brought the Debt Service Coverage Ratio below the required 1.25:1. There appears to be no dispute that, absent the $300,000 note, King Pin Lanes would have been in compliance with this provision.

negotiating with Marine Bank to resolve its concerns. The discussions included explanations of the $300,000 note, which the Debtor said was created for tax purposes, and counter proposals to cure the defaults. Ultimately, on January 13, 2017, Marine Bank and King Pin Lanes executed the First Amended and Restated Business Loan Agreement ("Amended Loan Agreement"), wherein Marine Bank agreed to "refrain from exercising its rights and remedies," other than its pursuit of the pending bankruptcy claims, as long as King Pin Lanes complied with the terms and conditions of that and any other agreements with Marine Bank. In exchange for this forbearance, King Pin Lanes agreed to subordinate all debts owed to the Debtors and maintain $115,000 in cash reserves at all times. Nowhere in the Amended Loan Agreement does it specifically state that the preexisting defaults would or would not be cured.

According to Mr. Neuger, the Amended Loan Agreement did not cure any defaults; it only provided for the bank's forbearance in the absence of further default. He said that the October 2016 default letter supports Marine Bank's position that the Amended Loan Agreement did not cure any defaults. But, again, the Amended Loan Agreement itself does not state that the defaults were not cured, and it makes no reference to the October letter. Rather, the Amended Loan Agreement specifically states that it, along with related notes, agreements, and security documents, "constitutes the entire understanding and agreement of the parties[.]" Mr. Neuger acknowledged that no action has been taken by Marine Bank since the Amended Loan Agreement was executed and that King Pin Lanes has reduced the principal on the debt by approximately $200,000 while the Debtors' bankruptcy has been pending. He maintained that the loans are still in

default.

Mr. Neuger testified that, as part of Marine Bank's own due diligence, it conducted site visits and inspected the property. He said that he, like other Marine Bank employees, had personally visited the bowling center. But, according to him, it was only after having the property appraised and inspected in connection with the present dispute and after the Amended Loan Agreement was executed that Marine Bank became aware of significant deferred maintenance. He stated that Marine Bank had received repair estimates totaling more than $1,000,000, but he did not substantiate his claim. According to Mr. Neuger, this deferred maintenance is a new default that was not covered under the Amended Loan Agreement.

Sometime after the Amended Loan Agreement was executed, Marine Bank hired Barry Taft, a certified appraiser of commercial real estate with 25 years experience in the Springfield area. Mr. Taft testified that he was asked by Marine Bank to value its real estate collateral related to King Pin Lanes. Mr. Taft visited the property in March 2017, completed the appraisal, and compiled an Appraisal Report dated June 9, 2017. Because Marine Bank's real estate collateral was a leasehold, Mr. Taft's appraisal was limited to valuing that leasehold interest. He admitted that he did not include the value of any equipment, fixtures, or income streams from the business in his appraisal. His valuation of the leasehold assumed that the subject property was not operating as a bowling center. Thus, he determined the leasehold interest to be simply the difference between the fee simple value and the leased fee. Estimating the fee simple value of the real estate at $650,000, Mr. Taft subtracted the value of the leased fee, which he calculated

at $734,000, to arrive at a leasehold value of a negative $84,000. Although the building was in a desirable location, Mr. Taft said that there was deferred maintenance and that the building was in "low-average" condition. Specifically as to the parking lot, he said that there were some holes and cracks that should be repaired but guessed that it still had a few years of useful life. Ultimately, because the lease would cost a potential lessee more than the fee simple value of the property itself, he concluded that the building would sit vacant.

Marine Bank also offered the testimony of Joe Hurwitz, a commercial real estate developer in Springfield, Illinois. Mr. Hurwitz said that he visited the King Pin Lanes property twice and determined that, despite the increasing desirability of the location, it would cost more to remodel or update the property than it would to tear the building down and erect a new one. He said a significant portion of maintenance had been deferred, including the parking lot, HVAC, plumbing, and electrical. He also stated that it would be difficult to justify redeveloping the property unless there was a lease term of at least 40 years to amortize costs and still realize a profit. Mr. Hurwitz did admit that he was looking at the property as a developer and that he did not consider the value of the property if sold as a bowling center.

UCB hired Patrick Bosco to evaluate King Pin Lanes and estimate a likely sales price for the business. Mr. Bosco, an associate with Sandy Hansell & Associates, the largest broker of bowling centers in the country, testified that he did valuations of bowling centers in anticipation of marketing and selling them. Although he admitted he is not a certified appraiser, he said that he has worked in the bowling industry for 50 years, the last 17 of which he has spent with Sandy

Hansell & Associates. In valuing a bowling center, he visits the center and takes a profile of the building, equipment, financial records, location, and competition. He said that, while the market for bowling centers is currently active, generally, a center must be operating in order for it to draw interest.

Mr. Bosco did a profile of King Pin Lanes, which was compiled into a report dated August 25, 2017. He concluded that the business could likely be sold as a going concern for $1,500,000. In reaching this figure, Mr. Bosco took into consideration the company's financial records, the fact that the land and building were leased, and the overall condition of the property. Considering profitability to be the most significant factor in establishing a likely sales price, he said that, generally, a price can be estimated by multiplying yearly gross revenues by a factor between 1.7 and 2. According to Mr. Bosco, the business appeared to be profitable, but he did note there were some gaps in financial records, which affected his valuation. Likewise, Mr. Bosco stated that the market for bowling centers operating on leased property is smaller, which could negatively impact the sales price due to possible concerns about being able to amortize the cost of necessary improvements. And while he thought the building and parking lot were in fair condition, he also said that the property needed a little work. Taking all of this into account, Mr. Bosco determined that the sales price should be discounted and ultimately estimated it by multiplying the average yearly gross revenues for the preceding three-year period—approximately $1,200,000—by a lower factor of 1.25. Because the center was at a good location, in a good market, with little competition, he believed $1,500,000 was a fair sales price. He conceded, however, that he did not physically inspect every aspect of the building and relied, in part,

on the representations of Mrs. Benanti.

According to Mrs. Benanti, the property is in overall good condition. She said the roof was replaced in 2014 and 2015, the parking lot has been patched some but is not currently in need of repair, and that other updates have been made inside the building. Since she has taken over management, the company has been profitable. Additionally, she said she has been able to accumulate approximately $250,000 in savings held in the company. Prior to Mr. Benanti's stroke, the Debtors had not accumulated any savings. She plans to run King Pin Lanes for as long as necessary.

Following trial, the matter was taken under advisement. Having considered the evidence and arguments presented by both parties, the matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the administration of the estate, the allowance of claims against the estate, and the adjustment of the debtor-creditor relationship are core proceedings. 28 U.S.C. §157(b)(2)(A), (B), (O). This matter arises from the Debtors' bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

A claim, proof of which is filed under §501, is deemed allowed, unless a party in interest, including a creditor in a Chapter 7 case, objects. 11 U.S.C. §502(a). Generally, if such an objection is made, the court, after notice and hearing, shall determine the amount of such claim as of the date of the filing of the petition and allow the claim in that amount, unless one or more enumerated exceptions apply. 11 U.S.C. §502(b). A proof of claim is prima facie evidence of its own validity and amount, and the party objecting to the claim therefore has the initial burden of proof to rebut the presumption of allowability. Fed. R. Bankr. P. 3001(f); *In re Tires N Tracks, Inc.*, 498 B.R. 201, 203-04 (Bankr. N.D. Ill. 2013). Once some evidence questioning the allowability of a claim is produced, the burden shifts back to the claimant to establish that the claim is in fact allowable. *Tires N Tracks*, 498 B.R. at 204. Once ruled on, a claim may be reconsidered for cause, and the reconsidered claim may be allowed or disallowed according to the equities of the case. 11 U.S.C. §502(j).

A "claim" is generally defined as including a "right to payment, whether or not such right is . . . unliquidated . . . [or] contingent[.]" 11 U.S.C. §101(5)(A). And while the contingent or unliquidated nature of a claim is not a basis for disallowance, it does require estimation for purposes of allowance where the fixing or liquidation of the claim would unduly delay the administration of the case. 11 U.S.C. §502(b)(1), (c). The estimation process being "a microcosm of the ordinary claims-determination process[,]" the allocation of the burdens of proof in a proceeding to estimate a contingent claim is the same as a proceeding to determine the allowability of a claim. *In re FRG, Inc.*, 121 B.R. 451, 456 (Bankr.

E.D. Pa. 1990) (applying the same standard in the context of estimation for purposes of voting on a Chapter 11 plan).

## A. Contingent Claims

UCB contends that Marine Bank's claims are contingent. The Code does not define what makes a claim contingent. But courts have defined a contingent claim as one that "has not yet accrued and which is dependent upon some future event, an event that may in fact never happen." *In re Kreisler*, 407 B.R. 321, 325-26 (Bankr. N.D. Ill. 2009) (collecting cases).

At issue here are two proofs of claim filed by Marine Bank based on personal guaranties executed by the Debtors to secure a loan made by Marine Bank to King Pin Lanes. A guaranty is a contract between a guarantor and a creditor, with the guarantor agreeing to be secondarily liable to the creditor for a debt or obligation owed to the creditor by a third party. It is a "classic" example of a contingent claim. *In re Clore*, 547 B.R. 915, 923 (Bankr. C.D. Ill. 2016) (Perkins, J.) (citing *In re Barnett*, 42 B.R. 254 (Bankr. S.D.N.Y. 1984); *In re Kaplan*, 186 B.R. 871 (Bankr. D.N.J. 1995)). In Illinois, the law is clear that "a guarantor's obligation to pay is not triggered until there has been a default by the primary obligor, either because the primary obligor has failed to pay the debt at its maturity, or because the debt has otherwise come due on account of a default of the primary obligor." *Clore*, 547 B.R. at 923 (collecting cases). Thus, a claim based on a guaranty is contingent unless the loan is in default. *Id.*; *In re F.B.F. Indus.*, 165 B.R. 544, 548-49 (Bankr. E.D. Pa. 1994).

Generally, the amount of an unsecured claim is fixed as of the date of the

filing of the petition. *See* 11 U.S.C. §502(b). It seems logical, then, that the petition date would be instructive in determining whether a claim is contingent. *See Kreisler*, 407 B.R. at 326. When the Debtors filed their petition commencing this case, the SBA Loans secured by the guaranties were in default. Although King Pin Lanes was and is current on payments, UCB conceded that Mr. Benanti's stroke, the change in management and transfer of majority membership interest of the company to Mrs. Benanti, noncompliance with the Debt Service Coverage Ratio provision, and the filing of the Debtors' bankruptcy petition were all events of default. Those defaults triggered liability, and, at that point, Marine Bank's claims were no longer contingent.

While the Debtors' case has been pending, however, Marine Bank and King Pin Lanes—through the Debtors as principals—have engaged in significant negotiations and ultimately entered into the Amended Loan Agreement, wherein Marine Bank agreed to "refrain from exercising its rights and remedies" regarding pending defaults as long as King Pin Lanes complied with all terms and conditions going forward in exchange for an agreement to subordinate all debts owed to the Debtors and maintain at all times cash reserves of at least $115,000. The question, then, is whether these postpetition events have any impact on resolving the dispute over Marine Bank's claims.

As a preliminary matter, the Court notes that, in determining whether the guaranties are contingent, it is appropriate to consider all facts and circumstances—not just those in existence on the petition date. As one court has noted, while §502(b) requires that the amount of a claim be determined as of the petition date, nothing in that section requires a court to ignore postpetition

changes in circumstances that impact validity. *In re Ernst*, 382 B.R. 194, 199 (S.D.N.Y. 2008). The reasoning of *Ernst* is applicable to determining whether a claim is contingent. First, §502 does not make reference to any point in time for determining whether a claim is contingent. Second, to ignore the realities of a situation simply because they did not exist at the time of the petition would be unconscionable. *See Ernst*, 382 B.R. at 199. Third, the *Ernst* approach is entirely consistent with the statutory scheme of §502.

Section 502(j) provides for claims to be reconsidered based on the equities of the case. 11 U.S.C. §502(j). Undoubtedly, if a claim were allowed but later became unenforceable, the equities of the case would justify reconsideration. Likewise, if a claim were contingent and liability became fixed after the petition date, the claimant would have cause to have the claim reconsidered. *See Kreisler*, 407 B.R. at 328. It would be nonsensical for the Court to ignore the fact that a claim may or may not be contingent when deciding the matter, only to reconsider the claim on that basis immediately thereafter. Presumably, that is also why §502(b)(1) specifically prohibits disallowing contingent claims based on being unenforceable due to the contingency. Surely, the drafters of the Code recognized the changing nature of contingent claims when they drew a distinction between those and noncontingent claims. It only makes sense, then, for the Court to consider all facts and circumstances as they then exist at the time of determining whether a claim is contingent.

With that in mind, the Court must determine whether, under Illinois law, once the Debtors' liability became fixed under the loans, it could become unfixed at a later date. In *Kaplan*, the New Jersey bankruptcy court was called upon to

determine whether a claim on a personal guaranty was contingent. *Kaplan*, 186 B.R. at 871. There, like here, the guaranteed loan was in default prior to the bankruptcy filing. *Id.* at 877. Sometime after the petition date but before the matter was decided, the parties to the loan negotiated and executed a restructuring agreement under which no default had occurred. *Id.* Before concluding that the creditor had waived the default existing on the petition date, the court explained that, under New York law, a debtor generally cannot be relieved of default unless there is waiver, estoppel, bad faith, fraud, or oppressive or unconscionable conduct on the part of the creditor. *Id.* at 876; *but cf. Cohen v. F.D.I.C.*, 1996 WL 464028, at *3 (D. Mass. Aug. 5, 1996) (holding that once default occurred, guarantor was liable to lender regardless of whatever else the parties worked out among themselves).

Waiver and implied waiver or estoppel are concepts that have long been recognized by Illinois courts. *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 104-06, 585 N.E.2d 46 (1991); *First National Bank of Lincoln v. Brown*, 90 Ill. App. 3d 215, 219, 412 N.E.2d 1078 (1980). Waiver is the intentional relinquishment of a known right. *Ryder*, 146 Ill. 2d at 104-05 (collecting cases). It can be made by express agreement or it may be implied from the conduct of the party who is alleged to have waived a right. *Id.* at 105. Generally, Illinois courts will not imply waiver of a contract right or term from conduct unless there has been reliance by the other side or waiver is clearly inferable from the circumstances. *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 383 Ill. App. 3d 645, 673, 891 N.E.2d 1 (2007). But where one party, by statements or conduct, leads another to do something that would not have been done but for the statements or conduct of the

other, the party on whose conduct the other relied will not be allowed to deny such conduct to the disadvantage of the other. *See First National Bank of Lincoln*, 90 Ill. App. 3d at 219.

Marine Bank argues that the Amended Loan Agreement did not waive any of its rights with respect to the prepetition defaults and that, in fact, it expressed only an intention to simply forbear from taking action on the existing defaults until such time as there is a new default. And while Marine Bank is correct that the Amended Loan Agreement expresses no intention of waiving the prepetition defaults, the practical effect of the Amended Loan Agreement is to bar Marine Bank from exercising its contract rights on the prepetition defaults as long as there are no defaults going forward. Moreover, there has clearly been reliance on the part of Mrs. Benanti and King Pin Lanes. In exchange for Marine Bank's agreement not to exercise its rights on existing defaults, Mrs. Benanti complied with the bank's demands to subordinate all existing and future debts owed by King Pin Lanes to her and Mr. Benanti and to maintain cash reserves of $115,000 in the business at all times. Mrs. Benanti testified that she thought, by entering into the Amended Loan Agreement, all issues would be resolved. Presumably, she would not have made the concessions otherwise. Marine Bank's attorney even acknowledged that, given the Amended Loan Agreement, Marine Bank would not be able to prevail in a state court action unless there were a new default. *See Kreisler*, 407 B.R. at 326; *see also Kaplan*, 186 B.R. at 874. This Court is not willing to hold that Marine Bank's claims are not contingent merely because defaults made unenforceable by agreement still technically exist. To do so would be to elevate form over substance. *Cf. Bailey v. Security National Servicing Corp.*,

154 F.3d 384 (7th Cir. 1998) (assignee of debt not a "debt collector" under the Fair

Debt Collection Practices Act because, while technically still in default, the

obligation was subject to an ongoing forbearance agreement). Unless there has

been a new default, Marine Bank's guarantee claims must be deemed contingent.

To that end, Marine Bank contends that there is a default based on deferred

maintenance on the building and parking lot that was not covered by the

Amended Loan Agreement.[3] According to Mr. Hurwitz, a significant portion of the

maintenance has been deferred, including the parking lot, HVAC, plumbing, and

electrical, which would be costly if the property were going to be redeveloped. Mr.

Neuger said he visited the property and saw the parking lot in disrepair and wires

hanging from the ceiling. He said Marine Bank had repair estimates totaling more

than $1,000,000 but did not elaborate on or substantiate this claim any further.

Mr. Bosco acknowledged that a little work was needed but said that the property

was in good condition, specifically noting that the parking lot was in fair condition.

Even Marine Bank's appraiser, Mr. Taft, stated that, while the parking lot had

some holes and cracks that should be repaired, it still had a few years of useful

life. And Mrs. Benanti described the property as being in good condition. She said

that the parking lot has been patched some but is not currently in need of repair.

Ultimately, Marine Bank failed to meet its burden of establishing a new

default based on any deferred maintenance. From the evidence presented, the

Court can surmise that some repairs or improvements may be beneficial. But the

---

[3] UCB put forth evidence to support the Court's finding that the Amended Loan Agreement waived existing defaults for purposes of determining whether the claims are contingent. As such, the burden shifted back to Marine Bank to establish that there was another default and that default was not covered by the Amended Loan Agreement. *See Tires N Tracks*, 498 B.R. at 204; *FRG*, 121 B.R. at 456.

Court also heard testimony from both parties that the need for repairs was not immediate—let alone deferred. Further, there is no credible evidence as to what necessary repairs might cost. While Mr. Hurwitz testified that significant costs would be incurred, his opinion was based on the property being redeveloped for an alternate use rather than continuing to operate as a bowling center. And it is unclear whether Mr. Neuger's unsubstantiated claim that repairs would cost $1,000,000 pertains to necessary repairs as opposed to desirable but not required improvements. Finally, Marine Bank offered no evidence as to how the condition of the property had changed since 2014, when the initial Business Loan Agreement was entered into. Based on the evidence before it, the Court cannot say that there is a default under the provision requiring King Pin Lanes to maintain the condition of the collateral.

Even were the Court to assume that there was a default based on King Pin Lanes' failure to maintain the property, it is not clear that such default was not waived by virtue of the Amended Loan Agreement. The Seventh Circuit has acknowledged that, in Illinois, "when a party lists specific objections to the sufficiency of performance," any other objections not made are deemed to be waived. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1343 (7th Cir. 1983); *see also Olcese v. Mobile Fruit & Trading Co.*, 112 Ill. App. 281, 286 (1904). Here, there is no question that the Amended Loan Agreement does not reference any pending defaults regarding maintenance of the collateral. But, if Marine Bank had knowledge of the condition of the collateral at the time it executed the Amended Loan Agreement, then it likely waived any related default by failing to address it while also inducing Mrs. Benanti to agree

to subordinate debts and keep significant cash reserves in King Pin Lanes. *See Chicago College of Osteopathic Medicine*, 719 F.2d at 1343.

Mr. Neuger claims that Marine Bank was not aware of the deferred maintenance at the time the Amended Loan Agreement was negotiated and executed. Conveniently, he testified that it was only after the appraisals and inspections conducted in 2017 in connection with the present dispute that he learned there was significant deferred maintenance. But Mr. Neuger also testified that, as part of its own due diligence, Marine Bank regularly monitored its loans and conducted site visits and inspections of its collateral. He said that he had personally visited the bowling center and saw the disrepair, but he did not say when this occurred. Regardless of when Mr. Neuger learned of any deferred maintenance, Mike Gillespie testified that, as a loan officer carrying out his duty to monitor loans, he visited the property in July 2015, after the Debtors filed their bankruptcy petition, and again in December 2015, noting only that the business was open and operating, that it had several bowlers midday, and that the restrooms were well-kept. Mr. Chandler also acknowledged that Marine Bank periodically reviews its loan accounts. In light of the considerable testimony that Marine Bank regularly monitors its loans and that its officers personally visited the bowling center operated by King Pin Lanes before the Amended Loan Agreement was executed, the Court finds Mr. Neuger's assertion that Marine Bank lacked any knowledge of the condition of the property at the time to be not credible. And whether Mr. Gillespie or another officer took notice of or reported any issues to Marine Bank is of no consequence. "[A]s a matter of agency law, a principal is presumed to have the collective knowledge of all of its employees and

agents." *Fifth Third Mortgage Co. v. Kaufman*, 2016 WL 2851554, at *6 (N.D. Ill. May 14, 2016).

In any event, based on the evidence before it, the Court cannot conclude that a default has occurred since the Amended Loan Agreement was executed. Because Marine Bank, for all practical purposes, waived the defaults identified in the Amended Loan Agreement and any others that were apparent at the time, the guaranty claims are contingent for claim allowance purposes.

## B. Estimation Under § 502(c)

Having concluded that Marine Bank's guaranty claims are contingent, the Court must estimate the claims for purposes of allowance. 11 U.S.C. §502(c); *In re Fox*, 64 B.R. 148, 150 (Bankr. N.D. Ohio 1986) (the language of §502(c) is mandatory and places an affirmative duty on the court to estimate contingent or unliquidated claims under proper circumstances). Neither the Bankruptcy Code nor Rules provide guidance for estimating claims. Thus, courts generally have wide discretion in determining what method should be used to estimate contingent or unliquidated claims. *Kreisler*, 407 B.R. at 328. But the prevailing standard is that the bankruptcy court should use "whatever method is best suited to the particular circumstances at issue." *Id.* at 329; *Kaplan*, 186 B.R. at 874; *Fox*, 64 B.R. at 153. With regard to contingent claims, factors considered by courts focus on the ability of the primary obligor to pay and the likelihood that the primary obligor will default under the terms of the note in the future. *Fox*, 64 B.R. at 153; *Kreisler*, 407 B.R. at 329.

Much of the evidence on the valuation of Marine Bank's claims focused on

the extent the debt could be paid from the liquidation of collateral in the event of default. UCB offered evidence that King Pin Lanes could be sold as a going concern for about $1,500,000. Marine Bank, on the other hand, offered evidence that the leasehold interest would be worthless in a liquidation. Care must be taken, however, so as not to conflate the ability of King Pin Lanes to pay its debt with the prospect of full payment through the liquidation of collateral upon default.

The various assets and liabilities of the borrower, including the value of any property held by the borrower securing the lender's debt, are, of course, relevant to the borrower's ability to pay. *Fox*, 64 B.R. at 153. For instance, if a borrower has real estate that could be sold to meet payment obligations but that sale would result in a loss of rental income used to pay debts, such facts could be relevant to determining the borrower's ability to pay. *See F.B.F. Indus.*, 165 B.R. at 552. But the fact that the borrower's property could be or might be liquidated to satisfy a debt is not dispositive. *Id.* at 551-52. The problem with focusing on the value of collateral or other property when estimating a claim based on the likelihood of default is that (1) it often presupposes default; and (2) generally, no steps need be taken to exhaust remedies against the borrower before seeking payment from the guarantor on an absolute guaranty or guaranty of payment. *Clore*, 547 B.R. at 922; *Kaplan*,186 B.R. at 875. Some courts have even refused to look at other collateral or property, finding they only need determine the likelihood of default occurring in the future that would trigger liability of the guarantor. *F.B.F. Indus.*, 165 B.R. at 551-52.

According to *Kaplan*, there is no imminent danger of default where the

borrower has the cash flow from the business to service the debt and other costs currently and in the future. *Kaplan*, 186 B.R. at 877. King Pin Lanes appears to have the cash flow to service its debt. Importantly, King Pin Lanes is current and has stayed current since the Debtors' case was filed. *See Kreisler*, 407 B.R. at 328. In fact, the evidence suggested that King Pin Lanes has never been in default of payment. Rather, despite earlier struggles, King Pin Lanes has been able to service the debt while increasing profits and building up savings in the business of approximately $250,000 since Mrs. Benanti took over management. Like Mr. Chandler, the Court sees no reason to be concerned. King Pin Lanes has consistently paid its debts when due.

Regardless of King Pin Lanes' ability to pay the obligation, there is a question as to the probability of another default unrelated to payment. As discussed, the loans were in default when the Debtors' bankruptcy case was commenced. But all of those defaults were remedied by the Amended Loan Agreement, and it is unlikely they will occur again. The problems started with Mr. Benanti's stroke. That caused the change in management and, ultimately, the transfer of majority membership interest to Mrs. Benanti. By entering into the Amended Loan Agreement, executed by Mrs. Benanti as principal of King Pin Lanes, Marine Bank has chosen to maintain its business relationship with King Pin Lanes notwithstanding those defaults. Likewise, the lack of recourse on the Debtors' guaranties due to their discharge in bankruptcy and the noncompliance with the Debt Service Coverage Ratio provision were remedied by Mrs. Benanti's subordination of debts and the liquidity covenant in the Amended Loan Agreement. No evidence was presented from which the conclusion can be drawn

that these or other specific defaults are likely to occur in the future.

Marine Bank's concerns are largely that it is not sufficiently secured, given the discharge of the Debtors' guaranties and the value of its other collateral. It is possible to construe this as an argument that there will likely be a default under the insecurity clause. But, under Illinois law, creditors may only exercise insecurity clauses if they in good faith believe that the prospect of payment or performance is impaired. *Watseka First National Bank v. Ruda*, 135 Ill. 2d 140, 148, 552 N.E.2d 775 (1990). The Court will not speculate as to the possible facts under which Marine Bank might justify exercising its rights under the insecurity clause. The Court can only decide the likelihood, based on the facts before it, of Marine Bank being able to exercise its remedies in state court based on a default triggered by deeming itself insecure.

Marine Bank has taken the position that it is not adequately secured, particularly given the discharge of the guaranties and the lack of equity in its collateral. But Marine Bank has never called the note and did not express any concerns until late 2016. When King Pin Lanes was approved for the loan in 2014, Marine Bank acknowledged that the company's liquidity was "somewhat limited" but concluded that its leasehold interest and other assets were "adequate and suitable to secure" the loan. As additional security, Marine Bank obtained personal guaranties from the Debtors. Within less than a year, the Debtors filed their individual bankruptcy petition. Marine Bank knew at that time that their recourse on the guaranties would be limited. Yet Marine Bank did not formally express its concerns about the guaranties until UCB filed its claim objections in October 2016. Thereafter, Marine Bank negotiated and executed the Amended

Loan Agreement that called for the subordination of all other debt and included a liquidity covenant to address its concerns. As this Court sees it, the Amended Loan Agreement must mean one of two things; either Marine Bank's concerns about insecurity were remedied by the agreement or the situation was not one in which Marine Bank truly believed itself insecure. Either way, under the current circumstances, it is doubtful that Marine Bank could successfully enforce its default remedies under the insecurity provision in state court. Marine Bank's attorney conceded as much at trial. More than one court has determined that it is not inappropriate to value a party's claim at zero when the bankruptcy court finds that the party probably would not succeed on the merits in a state court action. *Kaplan*, 186 B.R. at 874.

As the Seventh Circuit has stated—albeit in terms of determining whether a debtor was insolvent for purposes of §547—"[t]o value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). Here, King Pin Lanes entered into lending agreements with Marine Bank in 2014. Since then, King Pin Lanes has been current on its payment obligations, and the business has become increasingly profitable. There is no apparent danger of King Pin Lanes being unable to meet its payment obligations in the future. Further, the defaults existing at the time the Debtors' bankruptcy case was filed have been remedied and are not likely to occur again. Those defaults stemmed directly from the isolated and unexpected incident of Mr. Benanti's stroke. They are not a sign of some pattern of behavior that would indicate a likelihood of further default. If for no other reason, Marine Bank's

guaranty claims should be estimated at zero because there appears to be no danger of default by King Pin Lanes.

Even if a creditor's ability to collect full payment upon default were relevant—if not dispositive—in estimating contingent claims, Marine Bank failed to meet its burden of establishing the amount at which its unsecured claim should be estimated. The only evidence offered by Marine Bank was an appraisal of the leasehold interest in the property, valuing it at a negative $84,000. That valuation, however, was based on the assumption that the property would be put to a use other than as a bowling center, which would result in additional costs to a hypothetical tenant, and that the lease would not be extended beyond the contract terms. Marine Bank offered no theory under which a valuation based on such assumptions would, as a practical matter, form a basis for valuation of its unsecured claim here.

If King Pin Lanes were to default on its obligations to Marine Bank, Marine Bank could exercise its default remedies and either work with Mrs. Benanti to sell the business as a going concern or force the business to close. If the business were sold as a going concern, the lease would be assigned to the new buyer for some amount of money. If the business were closed and lease payments were not made, the landlord would likely terminate the lease. A sale of the property by the landlord after the lease termination would not involve a sale of any interest of King Pin Lanes or Marine Bank in the property, and neither would have a claim to any sale proceeds. The lack of any right to a portion of the sale proceeds for Marine Bank under that scenario would be based on the pre-sale termination of Marine Bank's interest in the property rather than on a negative valuation of its interest

such as calculated by Mr. Taft. Marine Bank presented no scenario under which
Mr. Taft's valuation methodology would be relevant to an actual sale of King Pin
Lanes or the leased property.

Mr. Taft also admitted that he did not consider the value of Marine Bank's
other collateral, including personal property, equipment, and fixtures, noting only
that such items would probably not have much value. He said, however, that his
expertise was in real estate appraising and claimed no knowledge whatsoever
about evaluating the types of personal property involved here. His testimony was
not sufficient to support a valuation of zero to be placed on the personal property
assets of King Pin Lanes. At the very least, in the event of a liquidation, Marine
Bank could expect to recover whatever cash is held by the company at the time.
After all, King Pin Lanes is required to maintain $115,000 in cash reserves at all
times under the Amended Loan Agreement, and Mrs. Benanti testified that she
has actually built up savings in the company of approximately $250,000. Marine
Bank wholly ignored the possibility of recovering any value from any collateral
other than the leasehold interest, even though it clearly would recover the cash
reserves under its control.

UCB offered evidence that King Pin Lanes could be sold as a going concern
for around $1,500,000. And while Marine Bank did cast doubt on the accuracy
of UCB's valuation, UCB put forth enough evidence to support a finding that there
is some value to be realized if the business were marketed as a going concern.
There is no dispute that the location of the property is highly desirable—both of
Marine Bank's experts said just that. And, according to Mr. Bosco, there is little
competition for bowling centers in the Springfield area. With more than

$1,000,000 in annual revenue, King Pin Lanes could, very likely, be sold as a going concern. Whether the business would bring a sale at a price high enough to satisfy its debt to Marine Bank is not at all clear. But, based on the evidence presented, the going-concern value of King Pin Lanes cannot be placed at zero. Whatever standard is used, it was ultimately Marine Bank's burden to prove the amount of its claim in the face of evidence calling it into question. *See Tires N Tracks*, 498 B.R. at 204; *FRG*, 121 B.R. at 456. In light of the fact that it did not even consider the value of some of its collateral and in view of UCB's evidence that there is some going-concern value in King Pin Lanes, Marine Bank failed to establish the amount at which its unsecured claims should be estimated.

### IV. Conclusion

A guaranty claim is contingent unless it is in default. If a claim is contingent, it is necessary to estimate its amount in light of the likelihood that the borrower will default in the future. 11 U.S.C. §502(c); *Kreisler*, 407 B.R. at 329. Because King Pin Lanes is not currently in default of the SBA Loans, Marine Bank's claims against the Debtors and their bankruptcy estate are contingent. Because it is unlikely that King Pin Lanes will be in default of the SBA Loans in the future and Marine Bank failed to establish a proper basis for estimation of its claims, the Court will estimate Marine Bank's guaranty claims at zero.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ###